IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

SIERRA CLUB,

              Plaintiff,

    vs.

FRANKLIN COUNTY POWER OF ILLINOIS,
LLC f/k/a EnviroPower of Illinois, LLC;
ENVIROPOWER, LLC; and
KHANJEE HOLDING (US) INC.,

              Defendants.

Case No. 05-cv-4095-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on the cross motions for summary judgment filed by plaintiff the Sierra Club (Doc. 51) and defendants Franklin County Power of Illinois, LLC ("FCP"), EnviroPower, LLC ("EnviroPower") and Khanjee Holding (US) Inc. ("Khanjee") (Doc. 63). The parties have responded to the respective motions (Docs. 90 & 93), and replied to the respective responses (Docs. 96 & 97). In conjunction with the parties' summary judgment motions, the Court considers the Sierra Club's motion to strike (Doc. 72) and the defendants' response (Doc. 74), the defendants' motion to exclude testimony (Doc. 77) and the plaintiff's response (Doc. 82), and the defendants' motion to strike (Doc. 78), the plaintiff's response (Doc. 83) and the defendants' reply (Doc. 88). The Court also considers the defendants' motion to dismiss (Doc. 65), to which the Sierra Club has responded (Doc. 92), and to which the defendants have replied (Doc. 98).

The Sierra Club believes that the defendants are proposing to construct a power plant in Benton, Illinois, ("Plant") without a required permit. They bring this suit under the citizen suit provision of the Clean Air Act ("CAA"), 42 U.S.C. § 7604(a), seeking an injunction stopping that

construction until the defendants obtain a valid permit as well as fines, costs and attorney's fees. The defendants contend that the Court does not have jurisdiction to hear this suit and, alternatively, that the Sierra Club is barred by the Constitution and by statute from bringing this suit and that the defendants possess the required permit. The Court will briefly review the relevant statutory and regulatory provisions before addressing the defendants' jurisdictional argument. If necessary, it will then proceed to analyze the substantive issues raised in the pending motions.

## I.    Statutory and Regulatory Framework

Congress enacted the CAA, 42 U.S.C. § 7401 *et seq.*, in part to protect the public from the harmful effects of air pollution. To this end, the act includes provisions aimed specifically at preventing significant deterioration of air quality. 42 U.S.C. §§ 7470-7492. Among those provisions is one that states:

> No major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless – (1) a permit has been issued for such proposed facility in accordance with this part setting forth emission limitations for such facility which conform to the requirements of this part. . . .

42 U.S.C. § 7475(a). The permit referred to in this provision is commonly called a "PSD permit." A PSD permit contains an emission limitation which the permit issuer, the Illinois Environmental Protection Agency ("IEPA") in Illinois, has determined reflects the best available pollution control technology (the "best available control technology" or "BACT"). *See* 42 U.S.C. §§ 7475(a)(4) & 7479(3).

The United States Environmental Protection Agency ("EPA"), which Congress has charged with promulgating regulations to implement the CAA, has promulgated a regulation stating that a PSD permit becomes invalid:

if construction is not commenced within 18 months after receipt of such approval, if construction is discontinued for a period of 18 months or more, or if construction is not completed within a reasonable time. The Administrator may extend the 18-month period upon a satisfactory showing that an extension is justified.

40 C.F.R. § 52.21(r)(2). The expiration is automatic and does not rely on any action by any agency to take effect. *See* 40 C.F.R. § 124.5(g)(2) ("PSD permits may be terminated only by rescission under § 52.21(w) or by automatic expiration under § 52.21(r)."); *Grand Canyon Trust v. Tucson Elec. Power Co.*, 391 F.3d 979, 983-84 (9th Cir. 2004) (interpreting a nearly identical prior version of the regulation). Owners or operators seeking to construct major emitting facilities run the risk that if a PSD permit expires, they will then be subject to stricter BACT standards when applying for a new permit because of pollution control developments since their original permits were issued.

Congress defines commencement of construction of a major stationary source of air pollution (like the Plant) to mean:

that the owner or operator has obtained all necessary preconstruction approvals or permits required by Federal, State, or local air pollution emissions and air quality laws or regulations and either has (i) begun, or caused to begin, a continuous program of physical on-site construction of the facility or (ii) entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time.

42 U.S.C. § 7479(2)(A). The EPA similarly defines commencement of construction to mean:

that the owner or operator has all necessary preconstruction approvals or permits and either has:

(i) Begun, or caused to begin, a continuous program of actual on-site construction of the source, to be completed within a reasonable time; or

(ii) Entered into binding agreements or contractual obligations, which cannot be cancelled or modified without substantial loss to the owner or

3

operator, to undertake a program of actual construction of the source to be completed within a reasonable time.

40 C.F.R. § 52.21(b)(9).

The EPA further defines "beginning actual construction" to mean:

in general, initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying underground pipework and construction of permanent storage structures. With respect to a change in method of operations, this term refers to those on-site activities other than preparatory activities which mark the initiation of the change.

40 C.F.R. § 52.21(b)(11).

## II.    Facts

There is no dispute over many of the relevant facts in this case. The Court sets forth the undisputed facts in this section and will discuss the disputed facts as they become relevant to the resolution of the pending motions.

All parties agree that in December 1999, EnviroPower entered into a 99-year lease with Old Ben Coal Company (a subsidiary of Horizon Natural Resources) for the land on which it intends to build the Plant and that in December 2000, EnviroPower assigned the lease to FCP.

They also agree that in August 2000, FCP requested that the IEPA issue a PSD permit, that the Sierra Club did not participate in the review process for issuing the PSD permit, and that on July 3, 2001, the IEPA issued FCP a PSD permit. On July 9, 2003, FCP actually received the PSD permit, which contained the following provisions:

19a. This permit shall become invalid as follows, pursuant to 40 CFR 52.21(r)(2). This condition supersedes standard Condition 1. The Illinois EPA is administering these standards in Illinois on behalf of the United States EPA under a delegation agreement.

This Permit shall become invalid if construction of CFB [circulating fluidized bed] boilers is not commenced within 18 months after this permit becomes effective, if

4

construction of these boilers is discontinued for a period of 18 months or more, or if
construction of these boilers is not completed within a reasonable period of time.

b.  For purposes of the above provisions, the definitions of "construction" and "commence"
at 40 CFR 52.21(b)(8) and (9) shall apply, which require that a source must enter into a
binding agreement for on-site construction or begin actual on-site construction.  (Also see
the definition of "begin actual construction," 40 CFR 52.21(b)(11)).

PSD Permit at 16-17.

Before and after receiving the permit, the defendants worked toward completion of the

Plant.  They obtained an engineering report and a scoping study, began working on a boiler design

and procurement of necessary resources and achieved other tasks essential to construction of the

Plant.  In mid-2002, Khanjee began to serve as the lead developer of the Plant project and shortly

thereafter hired Acres International, Inc. as a consulting engineer and began to evaluate

engineering companies to serve as the contractor for the Plant project.

All parties agree that sometime between November 21 and December 2, 2002,

EnviroPower and Black & Veatch entered into an agreement entitled "Construction Memorandum"

which had as its subject "Construction Agreement for 534 MW Franklin County Power of Illinois

(FPC) - EPC Contract" and had an effective date of December 1, 2002.  The Construction

Memorandum begins:

The following documents the agreements reached at meetings held in Cincinnati,
Ohio on November 21, 2002 and subsequent discussions concerning the EPC
[engineering, procurement and construction] contract for a 534 MW CFB project to
be executed on behalf of EnviroPower, L.L.C. under the conditions stipulated in the
following.

It also contains the following provisions, among many others:

Black & Veatch has exclusively been designated as ("CONTRACTOR"), and been
assigned to develop, in conjunction with EnviroPower, LLC as ("OWNER"), an

5

EPC Consortium for the Project, along with the EPC Contract.

The Parties agree that this CONSTRUCTION MEMORANDUM and the accompanying TERM SHEET form the agreement between the Parties.

The Parties agree to be forthwith legally bound by the TERMINATION OF CONSTRUCTION MEMORANDUM, TERM SHEET AND/OR EPC CONTRACT WITHOUT DEFAULT section of the accompanying Term Sheet. The remaining sections of the Term Sheet are agreed by the Parties and intended to be incorporated into the EPC Contract.

Contractor may . . . enter into a contractual agreement with one or more parties . . . to design and furnish the circulating fluidized bed (CFB) boilers and the steam turbine generator or to perform portions of the construction work. . . . .

CONTRACTOR is continuing to develop a firm price and Draft EPC Contract for the FPC project, based on the provisions of Article 7 hereof.

* * *

## AGREEMENT TO WORK TOGETHER

The OWNER wishes to award a contract for the EPC of the FCP PROJECT (hereinafter referred to as "EPC CONTRACT") to CONTRACTOR and to work exclusively with them as set forth herein with the good faith intent to complete the drafting and negotiation of said EPC Contract on the basis of the attached Term Sheet.

The PARTIES agree to work with each other in good faith in accordance with the terms of this CONSTRUCTION MEMORANDUM to complete the drafting and negotiation of the EPC CONTRACT, with the goal of agreeing and signing such EPC CONTRACT by September 1, 2005.

## EXCLUSIVITY

The PARTIES agree to work together on an exclusive basis for the term of this CONSTRUCTION MEMORANDUM which commences on December 1, 2002 and ends upon the earlier of the execution of the EPC Contract or November 30, 2005, or for such longer period as the PARTIES may jointly agree in writing in order to draft and negotiate the EPC CONTRACT for the FCP PROJECT. Therefore, the OWNER agrees that it will not directly or indirectly, alone or collectively, participate in discussions or negotiations with any other person(s) or entity(ies) other than CONTRACTOR concerning the EPC CONTRACT during the term of the CONSTRUCTION MEMORANDUM.

* * *

In accordance with this CONSTRUCTION MEMORANDUM, PARTIES shall further investigate various aspects of the FCP PROJECT in order to finalize the Contract Price and Project Schedule. . . .

* * *

This CONSTRUCTION MEMORANDUM shall expire upon the occurrence of any one of the following events:

* * *

(v)     The date of signature of the EPC CONTRACT for the FCP PROJECT.

The Term Sheet accompanying the Construction Memorandum included the following provisions:

PURPOSE     The proposed business terms and conditions contained herein, together with the documents listed in Attachment 1 to the CONSTRUCTION MEMORANDUM, form the basis of Owner and Contractor's agreement for engineering, procurement and construction ("EPC") of the Project.

The Parties agree to use reasonable diligence to complete a mutually acceptable final written contract with respect to the scope of work and terms and conditions described in the following Term Sheet.

The Term Sheet then listed numerous obligations and other terms to be included in the EPC Contract, including a ceiling for the price to be paid to Black & Veatch, a time period after construction begins (39 months) in which construction must be substantially completed and a maximum termination penalty payable if the parties fail to agree on an EPC Contract ($72 million).

The parties agree that on or around December 18, 2002, EnviroPower contracted with Alberici Constructors, Inc. for on-site, boiler-house sub-foundation work. The contract did not specifically call for pouring concrete, but Alberici's response to the "request for proposal" that preceded the contract included the tasks of excavating to competent rock, that is, a rock surface suitable to support the foundation, and pouring some concrete that would serve as part of the

foundation.  On January 3, 2003, four Alberici employees began delivering equipment to the proposed Plant site.  On January 8, 2003, Alberici employees began excavation.

In late January or early February, Alberici unexpectedly encountered obstructions in the form of underground reinforced concrete structures.  Because some of these structures would interfere with pouring concrete for EnviroPower, Alberici began removing them from the site.  At some point after Alberici submitted its first invoice to EnviroPower on February 5, 2003, a dispute over payment arose.  On February 14, 2003, Alberici stopped excavating and stopped removing the underground concrete structures.  The Alberici employees never completely removed the concrete obstacles, dug deep enough to find competent rock, or poured any concrete.  From February 2003 to June 2003, Alberici billed EnviroPower for work at the site, although after February 14, no worker billed time for actual excavation work.  The bills after February 14 included one day where workers showed up but performed no work; all other days included only the supervisor's hours spent maintaining a protective barricade of the site.  The vast majority of the amounts claimed after February 14 were for equipment rental.

On March 31, 2003, Khanjee and EnviroPower entered into a Development Agreement and Purchase Agreement, and in August 2003, Khanjee issued an Offering Memorandum seeking financial support for the Plant construction.  In 2004, the required financing became available.

In the meantime, FPC failed to make a payment of approximately $870,000 to Horizon for the lease of the site, which was due January 1, 2003.  After efforts to negotiate new lease arrangements or FPC's purchase of the land from Horizon failed, on January 27, 2004, Horizon sent the defendants a termination and eviction notice for non-payment of rent, effective February 7, 2004.  That summer, the site and any rights under the lease were transferred to Lexington Coal

8

Company ("Lexington") through Horizon's bankruptcy proceedings, and in July 2004 Lexington filled the hole dug by Alberici.

In September 2004, FPC contracted with J.M. Jones, Inc. for more excavation and for pouring concrete, and on September 29, 2004, Jones began digging. The following day, an inspector from the IEPA visited the proposed Plant site and found that construction had commenced. Jones later poured some concrete and moved an empty trailer to the site.

In the meantime, the IEPA reconsidered its finding that construction had commenced and instead made a preliminary finding that EnviroPower's PSD permit had expired and asked it for more information to review the permit status. The EPA also requested more information from the defendants.

On January 1, 2005, the Sierra Club issued the defendants a Notice of Intent to Sue. Shortly thereafter, the IEPA and the EPA again requested more information from the defendants, and EnviroPower responded to those requests. Neither agency, however, made a final determination as to the validity of EnviroPower's PSD permit.

On May 20, 2005, the Sierra Club filed this lawsuit under the citizen suit provision of the CAA alleging that the defendants propose to construct the Plant without a valid PSD permit. As of the date the lawsuit was filed, EnviroPower and Black & Veatch had not finalized the contract contemplated by the Construction Memorandum.

## III.    Jurisdiction

The defendants argue that the Court does not have jurisdiction to hear this suit because the Sierra Club has not alleged a cause of action under the CAA, because it is protected by a "permit shield" statute, and because it lacks standing to sue. They seek dismissal of this case under Federal

Rule of Civil Procedure 12(b)(1) and summary judgment under Federal Rule of Civil Procedure 56.

A.    Failure to State a Claim

The defendants argue that the Court has no jurisdiction to hear this case because the Sierra Club has failed to allege a CAA violation, which is a prerequisite to the Court's exercising jurisdiction under the citizen suit provisions of the act, 42 U.S.C. § 7604(a). They bring this challenge under Rule 12(b)(1).

A defendant can challenge a court's subject matter jurisdiction under Rule 12(b)(1) in two ways. He may make a facial challenge to the sufficiency of the complaint's jurisdictional allegations as a matter of law, in which case, as with a Rule 12(b)(6) motion, all well-pleaded factual allegations are accepted as true and construed in the light most favorable to the plaintiff. *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997); *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994); 2 James Wm. Moore *et al.*, *Moore's Federal Practice*, § 12.30[4], at 12-38 to 12-39 (3d ed.).

A defendant may also challenge the facts on which the complaint relies to allege jurisdiction, in which case the plaintiff is not entitled to have his allegations taken as true or to have any inferences drawn in his favor. *Sapperstein v. Hager*, 188 F.3d 852, 855-56 (7th Cir. 1999); 2 James Wm. Moore *et al.*, *Moore's Federal Practice*, § 12.30[4], at 12-38 to 12-40 (3d ed. 2000). To resolve a challenge to the facts, a court may receive and weigh evidence outside the allegations in the complaint to determine if it has subject matter jurisdiction over the case. *Sapperstein*, 188 F.3d at 855-56. In any case, the plaintiff has the burden of proving that subject matter jurisdiction exists. *Kontos v. United States Dep't of Labor*, 826 F.2d 573, 576 (7th Cir.

10

1987).

To the extent that the defendants raise a facial challenge to the Court's subject matter jurisdiction, that challenge is without merit. The Sierra Club filed this lawsuit under the provision of the CAA that states:

> Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf –
>
> * * *
>
> > (3) against any person who proposes to construct . . . [a] new . . . major emitting facility without a permit required under Part C of subchapter I of this chapter (relating to significant deterioration of air quality) [a PSD permit]. . . .
>
> The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation . . . and to apply any appropriate civil penalties. . . .

42 U.S.C. § 7604(a). It alleges that the PSD permit the defendants obtained in July 2001 to build the Plant expired when it did not commence construction within 18 months of receiving the permit and that construction of the Plant in light of that expiration violates the CAA. The defendants argue that because no official agency has declared their PSD permit expired or invalid, the existence of the permit deprives the Court of jurisdiction to hear suits under this provision of the CAA.

The defendants' argument is meritless. The Sierra Club has clearly alleged in the complaint that the defendants have proposed to construct the Plant, which all agree is a major emitting facility, after their PSD permit expired. Thus, it has stated a claim under § 7604(a)(3) and has presented a case or controversy over which the Court has subject matter jurisdiction. *See Grand Canyon Trust v. Tucson Elec. Power Co.*, 391 F.3d 979, 986 (9th Cir. 2004); *id.* at 985

11

("Unauthorized construction of a power plant violates the Clean Air Act and provides grounds for a citizen suit under the Act's citizen suit provision."). That no agency has explicitly found that the defendants' permit has expired is irrelevant to the Court's jurisdiction; this lawsuit does not seek to review final agency action under the Administrative Procedure Act, 5 U.S.C. § 706(2), but is brought as a citizen suit under the CAA, 42 U.S.C. § 7604(a), which requires no final agency action. In addition, that the Sierra Club may not ultimately prevail in its claim does not deprive the Court of jurisdiction to hear the claim.

To the extent that the defendants have put the Sierra Club to its proofs to establish the Court's subject matter jurisdiction by a preponderance of the evidence, *see McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 541 (7th Cir. 2006)*, as the remainder of this order explains, the Sierra Club has, in fact, carried that burden by proving the defendants' proposed violation of the CAA.

    B.   <u>Permit Shield</u>

The defendants also argue that this case must be dismissed under Rule 12(b)(1) because 42 U.S.C. § 7661c(f) gives them "jurisdictional immunity" from this suit. That statute states, in pertinent part, "Compliance with a permit issued in accordance with this subchapter [Subchapter V of the CAA] shall be deemed compliance with section 7661a of this title." The relevant portion of § 7661a(a) states, "[I]t shall be unlawful for any person to violate any requirement of a permit issued under this subchapter, or to operate . . . any other source required to have a permit under [the PSD program] . . . except in compliance with a permit issued by a permitting authority under this subchapter."

To the extent that § 7661c(f) may limit the jurisdiction given by Congress in § 7604(a), and

the Court expresses no opinion on whether it could, it does not limit the Court's jurisdiction in this case. By its terms, § 7661c(f) shields a facility from being found in non-compliance with a permit issued *under Chapter V of the CAA*, which deals with operating permits, not construction permits. *See* Sen. Rep. No. 101-228, 1990 U.S.C.C.A.N. 3385, 3731-32 (Dec. 20, 1989) ("Title V of the bill imposes a Federal requirement that major sources of air pollution, and certain other sources of air pollution, obtain operating permits. . . .  New and modified major sources are already required to obtain construction permits under the New Source Review and Prevention of Significant Deterioration [PSD] provisions of the current Act."). Accordingly, the permit shield law protects a facility only against being found non-compliant with § 7661a, which speaks only to operation of facilities. Because § 7661c(f) is inapplicable to the cause of action alleged in the case at bar, it does not deprive the Court of jurisdiction.

      C.    <u>Standing</u>

The defendants also argue that the Sierra Club had no Article III standing when it filed this suit. They argue that the grievances of the Sierra Club members are too generalized, speculative, unfounded and foreclosed by the aforementioned permit shield. They also argue that the Sierra Club did not even know about its members' grievances until after it filed the lawsuit. They raise these arguments in the context of summary judgment under Rule 56.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).

13

The evidence shows that the Sierra Club has Article III standing to bring this suit and that the defendants are not entitled to dismissal for lack of subject matter jurisdiction as a matter of law. The doctrine of standing is a component of the Constitution's restriction of federal courts' jurisdiction to actual cases or controversies. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see* U.S. Const. art. III, § 2. Standing contains three elements.

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical. . . . Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560-61 (internal citations, quotations and footnotes omitted). An organization has standing to sue on behalf of its members if "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

The Sierra Club has sufficiently established an injury in fact to at least one of its members. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). In this case, Barbara McKasson ("McKasson"), a Sierra Club member, has submitted an affidavit stating just that – that if the defendants build the Plant without the appropriate permit, the resulting levels of pollution from the operating Plant will directly affect her use and enjoyment of the Rend Lake area, which she visits and plans to continue visiting at least

14

every other year to fish, kayak or camp and which is located less than three miles from the proposed site of the Plant. She also states that the pollution that will be generated by the Plant constructed without an appropriate permit will also affect her use and enjoyment of her own property 45 miles from the proposed Plant site. This establishes an injury in fact of a Sierra Club member that is imminent and not conjectural or hypothetical.

The Sierra Club has also established a causal connection between McKasson's injury and pollution that will imminently emit from the Plant. "Traceability does not mean that plaintiffs must show to a scientific certainty that defendant's . . . effluent . . . caused the precise harm suffered by the plaintiffs. . . . Rather, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged." *Piney Run Pres. Ass'n v. County Comm'rs of Carroll Co.*, 268 F.3d 255, 263-64 (4th Cir. 2001) (internal citations and quotations omitted). It is clear that the Plant proposes to emit harmful pollutants including particulate matter, sulfur dioxide, nitrogen oxide and mercury, that are highly likely to be in the air where McKasson recreates. McKasson stated in her affidavit that levels of those pollutants allowed by the PSD permit the Sierra Club believes has expired would cause the imminent injury of which she complains. Thus, McKasson's injury is fairly traceable to the defendants' construction of the Plant allegedly without an appropriate permit.

Redressability has also been demonstrated. McKasson stated that PSD permits for power plants issued after the defendants' PSD permit contain lower BACT emission levels (as they should since technology tends to make advancements, not regressions) and that if the Court were to halt construction of the Plant until the defendants obtained a new PSD permit, the BACT emission levels for the new PSD permit would be lower and her exposure to harmful pollutants at Rend

Lake and at her home would be lessened. This is sufficient to establish the third element of

standing, redressability. That the defendants sought independently to reduce emission levels to

some unspecified level does not render McKasson's imminent injury non-redressable by Court

action.[1]

The defendants have not seriously challenged the Sierra Club's standing to sue on behalf of

its members. This is for good reason, because it is clear that the interests at stake in this lawsuit are

directly related to the Sierra Club's purpose of preserving and protecting air quality in the United

States and that this suit does not require the participation of individual Sierra Club members.

Furthermore, that McKasson did not know about this lawsuit until after it was filed does not negate

her standing to sue at the time the lawsuit was filed.

Because the Sierra Club has established its standing to bring this suit, the Court will not

dismiss this suit for lack of standing.

## IV.     Analysis

### A.     Constitutionality

The defendants raise two arguments why the Court should dismiss this suit pursuant to

Federal Rule of Civil Procedure 12(b)(6). When reviewing a Rule 12(b)(6) motion to dismiss, the

Court accepts all allegations as true and draws all reasonable inferences in favor of the plaintiff.

*Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005); *Holman v. Indiana*, 211 F.3d 399, 402 (7th Cir.

2000). The Court should not grant a motion to dismiss unless it appears beyond doubt that the

plaintiff cannot prove his claim under any set of facts consistent with the complaint. *Brown*, 398

---

[1]Because the Court has found that the Sierra Club has sufficiently established
McKasson's standing to sue, it does not need to address the standing of Varena Owen.

F.3d at 908-09; *Holman*, 211 F.3d at 405. "[I]f it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate." *Brown*, 398 F.3d at 909 (internal quotations omitted); *see Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 715 (7th Cir. 2006).

      1.    <u>Due Process</u>

The defendants argue that the Sierra Club cannot prevail in this action because they have a property interest in their PSD permit that cannot be terminated absent due process of law. The Sierra Club, on the other hand, contends that whatever property interest the defendants may have had in their PSD permit expired automatically by the terms of the permit and the applicable regulations and that if that interest has not yet expired, the process afforded in this legal proceeding suffices to satisfy due process requirements.

The defendants raise a procedural due process argument. The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. 14. "Procedural due process claims require a two-step analysis. The first step requires us to determine whether the plaintiff has been deprived of a protected interest; the second requires a determination of what process is due." *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir. 1996).

The defendants' argument is nonsensical. To the extent that they have a property right in its PSD permit because it has not expired and continues to be valid, they will prevail in this litigation and will not be deprived of a property interest. On the other hand, if the Court finds that their permit has expired, the defendants have no protected property right of which they could be deprived. The automatic expiration of the permit pursuant to 40 C.F.R. §52.21(r)(2) would not be

a deprivation of a property right but a limitation on the property right as it was initially created. Furthermore, to the extent that the defendants have a property right, the notice and opportunity to be heard in this litigation certainly provides adequate process.

2..  Separation of Powers

The defendants also argue that the citizen suit provision of the CAA violates the doctrine of separation of powers.  The Constitution separates governmental powers in to three coordinate branches – executive, legislative and judicial.  *Morrison v. Olson*, 487 U.S. 654, 693 (1988).  The doctrine of separation of those three powers is violated when a law impermissibly undermines the power of one branch or disrupts the balance between the branches by preventing one from accomplishing its constitutional functions.  *Id.* at 695.

The defendants rely on a dissenting opinion in *Friends of the Earth v. Laidlaw Environmental Services (TOC) Inc.*, 528 U.S. 167 (2000), in which Justice Scalia notes that citizen suit provisions, aimed at privately-selected law violators, may usurp the Executive Branch's authority and discretion to target law violators in a manner consistent with the public interest.  *Id.* at 209-10;  *see also id.* at 197 (Kennedy, J., concurring).  The defendants then represent, "The CAA, as currently interpreted, does not run afoul of Article II. . . .."  Def. Mot. Dism. at 18.

The schizophrenic nature of the defendants' argument stems from their fundamental misunderstanding of the Sierra Club's challenge.  The Sierra Club is not challenging the propriety of the substance of the defendants' PSD permit as it was originally issued but the PSD permit's continuing validity.  This is a perfectly appropriate challenge that falls squarely within the plain language of the CAA's citizen suit provision.

Furthermore, the defendants have not provided the Court with any binding authority or

18

substantive argument for finding that the citizen suit provision of the CAA unconstitutionally usurps Executive Branch power. The Court agrees with the *United States v. American Elec. Power Service Corp.*, 137 F. Supp. 2d 1060, 1065 (S. D. Ohio 2001), that the CAA's citizen suit provision does not impermissibly intrude on the Executive Branch's powers, and to the extent that higher courts continue to entertain CAA citizen suits without questioning the citizen suit provision's constitutionality, *see, e.g.,   Grand Canyon Trust v. Tucson Elec. Power Co.*, 391 F.3d 979 (9th Cir. 2004)*,* the Court finds no reason to find any unconstitutionality in this case.

    B.    <u>Merits</u>

    The parties have filed cross-motions for summary judgment. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable  inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396.

    The only question in this case is whether the PSD permit issued to the defendants on July 3, 2001, remains valid. For the following reasons, the Court finds that it is not.

    The PSD permit issued to the defendants expired automatically if the defendants did not commence construction within 18 months after receipt of the approval for the permit, if they discontinued construction for more than 18 months, or if the Plant was not completed within a reasonable amount of time. 40 C.F.R. § 52.21(r)(2). The Court need only address the first two

expiration-triggering events in this order because the evidence demonstrates that the defendants did not commence construction within 18 months of obtaining the permit and discontinued construction for more than 18 months.

In order to have commenced construction, as that phrase is understood in the CAA context, a permittee must have either (1) begun a continuous program of actual physical on-site construction of the facility, to be completed within a reasonable time or (2) entered into binding contracts to undertake a program of actual construction of the source within a reasonable time that could not be cancelled without substantial loss.  *See* 42 U.S.C. § 7479(2)(A);  40 C.F.R. § 52.21(b)(9).  The Court will address each of these two avenues of commencing construction in turn.

### 1.    Commencing a Program of Actual Physical On-site Construction

There is no evidence from which a reasonable factfinder could find that the defendants began a continuous program of actual on-site construction within 18 months after receipt of the PSD permit.

As a preliminary matter, the Court turns to the issue of the 18-month period.  The defendants make much of the specific expiration date of the 18-month period.  The Sierra Club claims that the 18 months expired on January 3, 2003, exactly 18 months from the date the permit was issued.  The defendants want to account for a 30-day delay in the effective date of the decision under 40 C.F.R. § 124.15(b), a three-day extension to allow for service of the permit under 40 C.F.R. § 124.20(d), and a one-day "grace period" under 40 C.F.R. § 124.20(a).  They use these extra periods to argue that the 18-month period ended on February 10, 2003.  While the Court has doubts about whether the defendants are entitled to all of the additional time they claim, the Court

declines to resolve the issue because even if they are correct in their calculations, they did not

begin a continuous program of actual on-site construction before February 10, 2003.

The excavation activities of Alberici that began in January 2003 do not qualify as the

beginning of a continuous program of actual on-site construction. As noted earlier in this order,

the EPA defines "beginning actual construction" to mean:

> in general, initiation of physical on-site construction activities on an emissions unit
> which are of a permanent nature. Such activities include, but are not limited to,
> installation of building supports and foundations, laying underground pipework and
> construction of permanent storage structures. . . .

40 C.F.R. § 52.21(b)(11). The EPA construes "physical on-site construction" consistent with a

memorandum issued by the agency which states, in pertinent part:

> We have interpreted physical on-site construction to refer to placement, assembly,
> or installation of materials, equipment, or facilities which will make up part of the
> ultimate structure of the source. In order to qualify, these activities must take place
> on-site or must be site specific. Placement of footings, pilings and other materials
> needed to support the ultimate structures clearly constitutes on-site construction.
> As stated in the preamble to the draft regulations, "it will not suffice merely to have
> begun erection of auxiliary buildings or construction sheds unless there is clear
> evidence (through contracts or otherwise) that construction of the entire facility will
> definitely go forward in a continuous manner". Activities such as site clearing and
> excavation work will generally not satisfy the commence construction
> requirements.

Memorandum from Edward E. Reich, Director of Stationary Source Enforcement, to David Kee,

Chief Air Enforcement Branch Region V, Subject: "Commence Construction" under PSD, at 2

(July 1, 1978) ("Reich Memorandum").

It is true that the Reich Memorandum was not promulgated in the exercise of authority

expressly delegated by Congress; it was not the result of the quintessential types of Congressional

delegation – an adversarial proceeding or notice-and-comment rulemaking. It is therefore not

binding on the courts under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467

U.S. 837 (1984). *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001); *Christenson v. Harris Co.*, 529 U.S. 576, 587 (2000). However, it is the sort of informal agency opinion that is entitled to some respect according to its persuasiveness. *Mead*, 533 U.S. at 228; *Skidmore v. Swift & Co.*, 323 U.S. 134, 140-41 (1944). "'The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Mead*, 533 U.S. at 228 (quoting *Skidmore*, 323 U.S. at 140). Furthermore, an agency's opinion as to the proper interpretation of an ambiguous regulation should be given deference. *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see Christenson*, 529 U.S. at 588.

The Court finds the Reich Memorandum as a whole persuasive generally as to the interpretation of 42 U.S.C. § 7479(2)(A); 40 C.F.R. §§ 52.21(b)(9) & (11). The Reich Memorandum reflects detailed consideration of the question, and provides a relatively thorough analysis with numerous examples to guide application of the standards. The author held a position of knowledge and authority with respect to enforcement decisions and clearly contemplated the document to be used as a tool for enforcing the PSD permit requirements. Finally, there is no indication that the document is inconsistent with earlier or later EPA pronouncements. Thus, the Court finds the Reich Memorandum persuasive as to what constitutes "physical on-site construction" and should be given deference. *Auer*, 519 U.S. at 461.

The evidence, viewed in the light most favorable to the defendants, shows that the defendants' contract with Alberici in December 2002 may have been for excavation and for pouring concrete, but the actual work performed on the site involved only excavation and related

activities.  Furthermore, the excavation work ceased on February 14, 2003, and, with the exception of one day where workers showed up to work but did not do any work, from then until June 2003, an Alberici employee stayed at the job site to monitor the site but not to conduct any construction activities.  The defendants did not do any more construction work on the site after June 2003 until Lexington filled in the hole in the summer of 2004, and the defendants hired another company to do excavation and foundation work in September 2004.[2]  The Alberici activities were simply not the kind of continuous or on-going construction activities of a permanent nature such as those listed in 40 C.F.R. § 52.21(b)(11) or in the Reich Memorandum.

Under the applicable statutes and regulations, and consistent with the Reich Memorandum, excavation work alone without any further construction activity is simply not the type of action that would constitute "commencement of construction" sufficient to avoid expiration of the PSD permit.  This is so even if the reason for letting the hole lie dormant is a perfectly legitimate business reason – the need to change boiler suppliers and therefore also boiler plans or the discovery of unexpected underground obstructions.  In any case, there is no evidence that either before or after the excavation was stopped in February 2003, the construction of the facility as a whole was anticipated to "definitely go forward in a continuous manner."  Reich Memorandum at 2.  As discussed below, the Construction Memorandum evidenced no such concrete intentions, and the activity at the Plant site only amounts to the type of "clearing and excavation work" which the Reich Memorandum notes is not sufficient to constitute "physical on-site construction activities . . . of a permanent nature."  40 C.F.R. § 52.21(b)(11).

---

[2]For the purposes of this motion only, the Court assumes without deciding that the September 2004 activities at the site, which involved the pouring of concrete, may be the type of "actual construction" activities contemplated by the regulations and the Reich Memorandum.

The defendants point to the Construction Memorandum, three power purchase agreements entered into after this litigation began, their $30 million investment in this project, and their "program of construction," including the excavation work done by Alberici, to argue that they have commenced construction. They specifically point out the extensive work they did before February 2003 on engineering and design for their specialized boilers and the numerous studies and analyses they did in preparation for building the Plant. While the Court is certain that the defendants were diligently working towards building the plant during the 18-months after receiving the permit, the bottom line is that the type of work they did was not "physical on-site construction activity" and did not avert automatic expiration of the defendants' PSD permit pursuant to law, regulation and the permit's terms.

The defendants advance a confused argument that 40 C.F.R. § 52.21(b)(9) does not provide the appropriate rule of law because it does not use the identical language of 42 U.S.C. § 7479(2)(A) to define "commencement of construction." The Court finds any difference in the language to be immaterial to this lawsuit and insufficient to render the regulation in conflict with or an unreasonable interpretation of the statute. The Court further notes that the defendants have not convincingly explained how 42 U.S.C. § 7479(2)'s use of the phrase "a continuous program of physical on-site construction" does not express a Congressional intent that the continuous program of construction be physical and on-site. Finally, the defendants argue that the statutory and regulatory language cannot possibly mean what it says because as a practical matter it would foreclose the development of coal-fired power plants in Illinois, especially power plants that rely on the type of financing (non-recourse financing) the Plant relied on. If true, that is a matter the defendants should take up with their legislative representatives; until the law and regulations

change, the Court is bound to apply them as they are written.

Alternatively, no reasonable jury could find that construction activities were not discontinued from February 14, 2003, to September 20, 2004, a period of more than 18 months. Thus, under 40 C.F.R. § 52.21(r)(2) and the terms of the permit, the permit became invalid. The evidence shows that one Alberici worker stayed at the worksite to monitor the security of the worksite for approximately the first four months and that no other actual work was done until more than 18 months later when Jones began excavation work again in September 2004.

In sum, the Court finds that no reasonable factfinder could find that the defendants commenced a continuous program of actual physical on-site construction on the Plant within 18 months of receiving the permit or that they did not have a period of at least 18 months where construction activities were discontinued. In light of this finding, the Court need not address whether the Plant could be built within a reasonable time and will move to an examination of whether the defendants executed the type of contract that would prevent their PSD permit from expiring.

### 2.    Binding Contracts

There is no evidence from which a reasonable factfinder could find that the defendants entered into binding agreements to undertake a program of actual construction of the Plant to be completed within a reasonable amount of time.

As set forth earlier, a PSD permit will not expire if within 18 months of receipt of the permit, the permittee enters into "binding agreements or contractual obligations, which cannot be cancelled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed within a reasonable time." 40 C.F.R. §

25

52.21(b)(9)(ii). The Construction Memorandum and Term Sheet do not qualify as the type of binding contractual obligation that would avert expiration of the PSD permit. Again, the Reich Memorandum provides a persuasive interpretation of "a contractual obligation to undertake a program of construction":

> In order to satisfy the commence construction requirements, a contractual obligation must be a site specific commitment. The types of activities which will be considered site specific for purposes of a contract are identified in question #1 above [defining what constitutes physical on-site construction]. Contracts for work on footings, pilings, and other site specific materials and equipment will clearly satisfy the requirement while contracts for site clearing and excavation will not. The legislative history clearly indicates that contracts for non site specific equipment, such as boilers, will typically not suffice, regardless of any penalty clauses contained in the contracts.
>
> A Contractual obligation for purposes of commencing construction must also be one which cannot be cancelled or modified without substantial loss. The PSD regulations provide guidance on determining whether a loss should be deemed "substantial". A loss which would exceed 10% of the total project cost will clearly be considered substantial. Whether a loss of less than or equal to 10% of the total project cost will be considered substantial will be determined on a case by case basis.

Reich Memorandum at 2.

Viewing the evidence in the light most favorable to the defendants, it is unreasonable to believe that the Alberici contract for pre-construction and basic foundation activities could not have been cancelled or modified without a substantial loss. Therefore, if any contract can be sufficient to constitute "commencement of construction" it must be the Construction Memorandum and Term Sheet.

It is true that the Construction Memorandum and Term Sheet constitute a binding agreement. The plain language of the agreement demonstrates that both sides have made firm commitments to each other to conduct certain pre-construction activities, including working

together to reach an agreement on an EPC contract that contains the obligations and terms in the Term Sheet. That agreement also contains a termination penalty that binds the parties if no EPC contract is reached and that survives expiration of the agreement in the Construction Memorandum and Term Sheet.

The Construction Memorandum and Term Sheet are not, however, an agreement to undertake a program of actual construction of the Plant. The plain terms of the agreement require no more than working together to reach a further agreement – an EPC contract – and paying a penalty if no further agreement is reached. It clearly contemplates the execution of an EPC contract in the future that will contain definite terms – which had not been decided as of December 2002 – and that will bind the parties at that time to undertaking a program of actual construction. The Construction Memorandum and Term Sheet themselves contain no commitment to physically build anything on-site, contain no agreed upon price and set forth no schedule for any actual, physical on-site construction. There is no evidence of any meeting of the minds as to these essential construction contract terms. Furthermore, it appears that such critical terms remain undecided as recently as the spring of 2006, when a Black & Veatch representative informed EnviroPower that the target price and schedule envisioned in the Term Sheet are not achievable and encouraged EnviroPower to hire another contractor if one could meet those targets. That the agreement is not a binding agreement to undertake actual construction becomes evident when one considers whether EnviroPower would be able to sue Black & Veatch under the agreement for failing to build the Plant. There is simply no term in the Construction Memorandum or Term Sheet that would allow such a suit to succeed; those documents provide no binding commitment to build.

The defendants argue that the Construction Memorandum and Term Sheet are types of contracts that are customary in the industry and are an accepted part of the industry norm and they point to testimony of several witnesses that those documents constitute a contract to build the Plant.  That the documents are standard in the industry, however, does not mean they satisfy the requirements of 40 C.F.R. § 52.21(b)(9)(ii).  Similarly, that several witnesses characterize the agreement as an "EPC contract" is not sufficient to negate the plain meaning of the language of the documents themselves, which clearly evince a lack of any binding agreement to actually construct the Plant.  Furthermore, a December 6, 2002, memo from an EnviroPower vice president to its president recognized that even EnviroPower officers did not view the Construction Memorandum and Term Sheet, executed several days earlier, as an EPC contract:

> To maintain the validity of the air permit, The EnviroPower Team planned to enter into a binding Engineer Procure Construction (EPC) or other agreement some time prior to **January 3, 2003** and thus meet our commence construction requirement pursuant to [Permit] Article 19b.  Current circumstances indicate an EPC Contract prior to January 3[, 2003) is not possible.

For these reasons, the Court finds that the commitments in the Construction Memorandum and Term Sheet simply do not amount to an agreement to undertake a program of actual construction.  In light of this finding, the Court need not address whether the Construction Memorandum and Term Sheet could be cancelled or modified without substantial loss or whether the Plant could be constructed within a reasonable amount of time.  The motion to exclude the testimony of Thomas M. McCauley (Doc. 77) is therefore rendered moot.

In sum, viewing all the evidence and drawing all reasonable conclusions in the defendants' favor, no reasonable factfinder could find that the defendants had begun a continuous program of actual on-site construction of the Plant or had entered into a binding agreement to undertake a

program of actual construction of the Plant within 18 months of receipt of the PSD Permit.  No

reasonable factfinder could also fail to find that there was more than an 18-month hiatus in

construction activity.  Thus, by statute, regulation and the permit terms, the PSD permit expired

either in February 2003 or 18 months later, and continued construction of the Plant constitutes a

violation of the CAA.  For this reason, the Court will grant the Sierra Club's motion for summary

judgment (Doc. 51)[3] and will deny the defendants' motion for summary judgment (Doc. 63) and

motion to dismiss (Doc. 65).

## V.     Conclusion

For the foregoing reasons, the Court:

• **GRANTS** the Sierra Club's motion for summary judgment (Doc. 51);

• **DENIES** the defendants' motion for summary judgment (Doc. 63);

• **DENIES** the defendants' motion to dismiss (Doc. 65);

• **DENIES as moot** the defendants' motion to exclude the testimony of Thomas M. McCauley (Doc. 77);

• **DECLARES** that the defendants' construction of the Plant after February 10, 2003 violates the CAA;

• **ENJOINS** the defendants to stop actual construction of the Plant until they have obtained a valid PSD Permit;

• **VACATES** the final pretrial conference and trial dates;

• **DIRECTS** that the parties shall submit further briefing on the appropriate amount of fine to be imposed, if any.  The plaintiff's brief, which shall not exceed ten pages, shall be filed on or before November 17, 2006.  The defendants shall have ten days to file a response brief, which shall not exceed ten pages, and the plaintiff shall have ten days to file a reply brief, which shall not exceed five pages; and

---

[3]The defendants do not contest the Sierra Club's assertion that Khanjee shares liability in this case with EnviroPower and FCP.

•    **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**
**Dated: October 17, 2006**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**

30